Patricia ALEXANDER, James M. Okubo, and all others similarly situated, Plaintiffs,

v.

MOORE & ASSOCIATES, INC., dba Uni-Check, and Turner Corporation, dba Rentcheck, Defendants.

Civ. No. 79–0488.

United States District Court, D. Hawaii.

Dec. 30, 1982.

Steven Guttman, Honolulu, Hawaii, for Patricia Alexander.

John Paer, Legal Aid Society of Hawaii, Honolulu, Hawaii, for James Okubo.

John A. Hoskins, Honolulu, Hawaii, for defendants.

## DECISION AND ORDER

FONG, District Judge.

Plaintiffs were tenants who had a dispute with their landlords. Plaintiff Alexander refused to pay her landlord's claim for repairs and cleaning of her apartment after she moved out. Plaintiff Okubo paid his share of the rent to his roommate, but the roommate's check for the rent to the landlord bounced. The landlords were subscribers of RENTCHECK, a service which guarantees the payment of a tenant's security deposit. The landlords submitted claims to RENTCHECK for amounts which they claimed was due from the plaintiffs.

After paying the landlords' claims, RENTCHECK took an assignment of those claims and filed a report with UNI–CHECK, a check guaranty service, after both plaintiffs refused to reimburse RENTCHECK for the amounts paid to the landlords. UNI–CHECK gave both plaintiffs a "Code 4". This caused the plaintiffs to later have their checks refused by various merchants, and, in the case of plaintiff Okubo, prevented him from opening a checking account at a number of banks.

Plaintiffs, by Motion for Summary Judgment, contend that both defendants are in violation of the Fair Credit Reporting Act (15 U.S.C. § 1681 *et seq.*) and the Fair Debt Collection Practices Act (15 U.S.C. § 1692 *et seq.*).

## I. FAIR CREDIT REPORTING ACT.

Plaintiffs claim that both defendants violate the following provisions of the Act:

§ 1681 e(b)—maintaining reasonable procedures to assure maximum possible accuracy of the information.

§ 1681 e(a)—maintaining reasonable procedures to avoid violations of the statute and to assure disclosure to only authorized persons.

§ 1681 i(c)—notation of fact that statement of dispute is filed by consumer, with a summary of the statement of the consumer provided with the report.

§ 1681b—furnishing a consumer report to persons other than to those permitted by statute.

If the defendants were held to be within the purview of the Act, a finding of a willful violation or noncompliance with the requirements of the Act would render the defendants liable to the consumer for actual and punitive damages, as well as court costs and reasonable attorneys fees. 15 U.S.C. § 1681n. Negligent noncompliance with the Act's requirements would render the defendants liable to the consumer for actual damages as well as costs and attorneys fees. 15 U.S.C. § 1681o.

The threshold question is whether the Fair Credit Reporting Act has any application in the instant case, since the require-

ments of the Fair Credit Reporting Act apply only to "consumer reporting agencies". A "consumer reporting agency" is defined in U.S.C. § 1681 a(f) as:

> 1) any person who, for monetary fees,
> 2) regularly engaged in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers,
> 3) for the purpose of furnishing consumer reports to third parties,
> 4) and uses any means of interstate commerce for the purpose of preparing or furnishing consumer reports.

The only dispute in this regard is whether the defendants issue "consumer reports" as defined in the statute.[1] In particular, the dispute centers around the exclusion in 1681 a(d)(C):

> The term ["consumer report"] does not include ... (C) any report in which a person who has been requested by a third party to make a specific extension of credit directly or indirectly to a consumer conveys his decision with respect to such request ....

Defendants claim that the information given to landlords and merchants are not consumer reports, and are instead simply a communication of their decision to not extend credit to the consumer.

■ First, the defendants claim that UNI–CHECK is simply a check guarantee service, and that the Code 4 it issues simply means that it will not guarantee payment of checks drawn on the consumer's account. This, it claims, is a decision regarding an "extension of credit" to the consumer.

It is undisputed that UNI–CHECK provides information to banks in connection with the individual's opening a checking account. Defendants argue that when the banks call UNI–CHECK, they are inquiring whether UNI–CHECK will guarantee a check written by that person. The court finds that this argument borders on the facetious. It is more accurate to say that whenever a person applies to a bank to open a checking account which necessitates the bank's inquiry to UNI–CHECK, the purpose of the inquiry is for the purpose of determining whether the applicant has a good credit record. The bank does not benefit by, nor is it likely that it is really interested in, the particular datum that a person's checks will or will not be guaranteed by UNI–CHECK. The bank's inquiry to UNI–CHECK, then cannot reasonably be construed to be a request to extend credit to the customer.

Moreover, the exception under the statute is limited to situations where a *specific* extension of credit is requested. Even if the bank's inquiry could somehow be found to be a request for an extension of credit, it is at best a very generalized inquiry, i.e., "will you guarantee checks written by this person if we open a checking account in his name?" This cannot be considered sufficiently specific to fall under the explicit words of the statute.

In addition, it appears that UNI–CHECK's informational service is also provided to persons who do not purchase the check guarantee. Landlords would call UNI–CHECK, not RENTCHECK, to inquire about a prospective tenant. In so inquiring, they would get the same answers as would a merchant. UNI–CHECK also provides an inquiry-only service to merchants, with no guarantee. Finally, UNI–CHECK will provide to merchants an advice-only service, again with no guarantee, on certain other checks not falling within its guarantee, such as second-party checks, payroll checks, stopped payment checks, name only inquiries, checks accompanied by a temporary or renewal driver's license or driver's permit, checks where a social secur-

---

1. The definition of "consumer report" is as follows:

> The term "consumer report" means any written, oral or other communication of any information by a consumer reporting agency bearing on a consumer's credit, capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for [credit, employment, or other authorized purposes] ....

15 U.S.C. § 1681 a(d).

ity number is the only imprint on the check, checks on which a P.O. box number is the address, and multiple checks for a single sale. UNI–CHECK in these situations is not requested to provide any extension of credit to the consumer, and the exclusion would therefore not apply.

In sum, because UNI–CHECK does issue "consumer reports", and because the parties do not dispute that it does fit within the other requirements of the statute, it must as a matter of law be considered a "consumer reporting agency" within the purview of § 1681.

There is no specific allegation that RENTCHECK is a consumer reporting agency, or that the reports to a subscribing landlord (which uses a code designation similar to that used by UNI–CHECK) are "consumer reports" within the meaning of the statute. Further, while there is some indication that RENTCHECK reports losses of other besides itself, the record as it presently stands shows only that RENTCHECK reports only the names of those persons for whom it has had to pay on its rent guarantee. This would normally bring the matter under § 1681 a(d)(A), which excludes from the definition of "consumer reports" any report "containing information solely as to transactions or experiences between the consumer and the person making the report".[2]

Having found that UNI–CHECK falls within the purview of the Fair Credit Reporting Act, we now must consider whether any particular provision of the Act has been violated. Plaintiffs claim that there has been a violation of four provisions.

1. *Violation of § 1681 e(b)*. This section requires that the consumer reporting agency follow *reasonable procedures* to assure *maximum possible accuracy* of the information concerning the consumer. Plaintiffs

allege that, as a matter of law, the actions of UNI–CHECK violate this provision.

Plaintiffs argue that the use of information concerning a landlord-tenant dispute as a basis for a Code 4 designation gives an inquiring merchant an inaccurate impression of the credit worthiness of the consumer, since the merchant would normally assume that the Code 4 relates to bad check writing or other bad credit experiences. This assumption is encouraged by UNI–CHECK's service agreement with the merchant subscribers, which states that the information provided by UNI–CHECK relates to dishonored checks, cancelled credit cards, and other previous bad risk experiences.

Plaintiffs argue that problems in a landlord-tenant dispute have nothing to do with the above. When a Code 4 is given to a consumer, the inquiring merchant would naturally have in mind only cancelled checks and the like. Plaintiffs thus argue that UNI–CHECK has a duty to disclose the *nature of the reasons* for the Code 4 so as to not give the merchant the wrong impression.

UNI–CHECK counters that it has followed reasonable procedures, and that the Code 4 relates to the fact that a subscriber of UNI–CHECK (i.e., RENTCHECK) has suffered a loss because of the actions of the consumer. UNI–CHECK argues that the use of information relating to landlord-tenant disputes is reasonable, since it relates to the financial responsibility of the consumer.

Defendants argue that no cause of action will lie under § 1681 e(b) unless the consumer report is first determined to be "inaccurate", citing *Middlebrooks v. Retail Credit Co.*, 416 F.Supp. 1013 (N.D.Ga.1976). While *Middlebrooks* and other reported cases[3] may stand for such a general propo-

---

**2.** It may very well turn out that RENTCHECK should also be considered a consumer reporting agency. The computer files of both companies is shared between them, and a "Code 4" rating given by RENTCHECK appears to automatically become a "Code 4" in UNI–CHECK's files. Plaintiffs may therefore argue that a Code 4 reported to merchants in this context is really a

RENTCHECK report and not a UNI–CHECK report, but this question was neither raised nor briefed by either party, and it would therefore be inappropriate to consider it at this time.

**3.** *McPhee v. Chilton Corp.*, 468 F.Supp. 494 (D.Conn.1978); *Todd v. Associated Credit Bureau Services, Inc.*, 451 F.Supp. 447 (E.D.Pa.

sition, those cases are distinguishable because the information sought to be clarified could have been done so only by subsequent investigation and updating of the files, or by conducting further investigation and evaluation of matters beyond both their abilities and the scope of the obligations imposed by the Act. Such tasks would have imposed an unreasonable burden on the agencies. In the instant case, no such burdensome task would be imposed on the agency, since the clarifying information was simultaneously available, and needed no further evaluation or analysis.

I do not believe that the statute can be read as narrowly as the defendants propose, notwithstanding indications to the contrary by other districts. The statute does not require that a consumer reporting agency follow reasonable procedures to assure simply that the consumer report be "accurate", but to assure "*maximum possible accuracy*". Otherwise, it would seem that a consumer reporting agency could report that a person was "involved" in a credit card scam, and without regard to this section fail to report that he was in fact one of the victims of the scam. This result cannot have been contemplated under the Act.

One of the purposes of the Act, as stated in the Congressional statement of purpose, is "to insure that consumer reporting agencies exercize their *grave responsibilities* with *fairness,* impartiality, and a respect to the consumer's right to privacy", § 1681(a)(4) (emphasis supplied), and to require that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other *information in a manner which is fair and equitable to the consumer*", § 1681(b) (emphasis supplied).

■ The court therefore finds that section 1681 e(b) of the Act, fairly read, would apply to consumer reports even though they may be technically accurate, if it is shown that such reports are not accurate to the maximum possible extent. The inquiry,

however, would not end there. The statute does not flatly require maximum possible accuracy, only that the consumer reporting agency follow *reasonable procedures* to assure such accuracy. Thus, the determination of this issue would seem to involve a kind of balancing test.

Under this approach, the court, in determining whether a violation of § 1681 e(b) has occurred, would weigh the potential that the information will create a misleading impression against the availability of more accurate information and the burden of providing such information. Clearly, the more misleading the information, and the more easily available the clarifying information, the greater is the burden upon the consumer reporting agency to provide this clarification. Conversely, if the misleading information is of relatively insignificant value, a consumer reporting agency should not be required to take on a burdensome task in order to discover or provide additional or clarifying data, and it should not be penalized under this section if the procedures used are otherwise reasonable.

■ In applying this balancing test, the first consideration is whether the information provided by UNI–CHECK is misleading. This Court concludes that it is. Even when viewing the evidence in the light most favorable to UNI–CHECK, it is clear that consumers are given a Code 4 even though there is no prior history of bad check writing, possession of cancelled credit cards, or other acts which directly relate to a person's credit history. While UNI–CHECK may argue that a Code 4 at most shows that a subscriber has incurred a loss caused by the consumer, it is equally clear that a merchant or bank receiving such a response to their inquiry would normally assume that the consumer has had prior bad check writing, carrying cancelled credit cards, or other similar experiences. This is supported by UNI–CHECK's service agreement, which begins as follows:

1977), *aff'd. mem.,* 578 F.2d 1376 (3d Cir.1978), *cert. den.,* 439 U.S. 1068, 99 S.Ct. 834, 59

L.Ed.2d 33; *Austin v. BankAmerica Service Corp.,* 419 F.Supp. 730 (N.D.Ga.1974).

UNI–CHECK has accumulated and transferred into electric computing equipment, information concerning persons who are known or reputed to have negotiated checks which are subsequently dishonored. UNI–CHECK has also obtained information concerning cancelled credit cards, as well as other valuable reports reflecting previous bad risk experiences
. . . .

Other parts of the Service Agreement also support such a conclusion:

1. Subscriber agrees to promptly provide UNI–CHECK with current information regarding subscriber's check cashing and credit card experiences, relating to insufficient funds, forgeries, nonexistent and closed accounts, and other information indicating bad risk experiences.

. . . . .

3. UNI–CHECK will mail one copy to each branch of periodic bulletins alerting subscribers to bad check passers and credit card risks.

The inescapable conclusion a subscriber would come to after reading the Service Agreement is that a negative report from UNI–CHECK would relate to the kind of "bad risk experiences" listed in paragraph 1. It does not seem reasonable that a merchant, in receiving a Code 4 response to its inquiry, would consider that such a negative response could relate to a landlord-tenant problem instead of a bad check writing or credit card history. Even if the thought somehow crosses a merchant's mind, he would most likely assume that the Code 4 in any particular instance would relate to the kind of information described in paragraph 1 of the Service Agreement.

Having concluded that a Code 4 as it relates to the facts of the instant case is misleading, the next task is to determine the availability of other or further information which would diminish or eliminate the misleading nature of the report, and the ease with which such clarifying or additional information can be provided.

In oral argument, counsel for the plaintiff suggested that, as credit bureaus in other parts of the country do, a range of codes could be given to distinguish between a landlord-tenant problem, a credit card problem, bad check writing experiences, and so forth. This court need not go so far as to require such different codes for different alleged bad risk experiences, since such relief is not so broadly claimed before this court. It is sufficient to note that it should be a simple matter for UNI–CHECK to use a different code designation, a "Code 7", for example, to distinguish between landlord-tenant problems and the kinds of experiences specified in UNI–CHECK's service agreement. This is already done by UNI–CHECK in connection with bank inquiries.

Further, there can be no reasonable dispute concerning the availability of the fact that the problem is a landlord-tenant one, since this fact is known to UNI–CHECK at the instant it receives its report from RENTCHECK. In weighing the misleading nature of the Code 4 in this situation against the instant availability of clarifying information and the ease with which this clarifying information can be made available, the court concludes as a matter of law that UNI–CHECK is in violation of § 1681 e(b) in failing to use *reasonable procedures* to assure the maximum possible accuracy of the report.

2. *Violation of § 1681 i(c).* This section provides:

Whenever a statement of dispute is filed [by the consumer], unless there is reasonable grounds to believe that it is frivolous or irrelevant, the consumer reporting agency *shall,* in any subsequent consumer report containing the information in question, *clearly note that it is disputed by the consumer and provide either the consumer's statement or a clear and accurate codification or summary thereof.* (emphasis supplied)

Plaintiffs argue that there is a violation of this section as to Plaintiff Okubo (Plaintiff Alexander did not file a statement of dispute) because UNI–CHECK did not attach a statement of Okubo's dispute. UNI–CHECK, however, argues that it did show that the account was disputed by giving Mr.

Okubo a *Code 5* (disputed account), although it did not attach a copy of his statement or a summary thereof because it claims it had reasonable cause to believe that it was "irrelevant".

 UNI–CHECK's argument may at first blush appear to have some merit, since Mr. Okubo's payment to his roommate of the rent is not a valid defense to his obligation to pay the rent to his landlord. UNI–CHECK's problem, however, is that it cannot on the one hand claim that information regarding a consumer's prior landlord-tenant dispute is relevant for credit purposes, and on the other hand argue that the consumer's challenge to the heart of that information is "irrelevant". This is especially true where the report in the instant case of this landlord-tenant problem is allegedly being provided as evidence of Mr. Okubo's financial responsibility. Mr. Okubo's statement shows that he was in fact responsibly paying his rent, but that his roommate absconded with the money. If landlord-tenant problems are relevant to a consumer's fiscal responsibility and for that reason included in a consumer report, a dispute of such information tending to negate a conclusion of financial irresponsibility is likewise relevant, and it is incumbent upon UNI–CHECK to follow the requirements of § 1681 i(c).

In the instant case, UNI–CHECK did note that the report was disputed by Mr. Okubo. What it did not do was provide either his statement of dispute or a clear and accurate codification or summary thereof. There is therefore a clear violation of § 1681 i(c), and summary judgment on this issue is granted in favor of plaintiff Okubo.

3. *Violation of § 1681 b(3).* Section 1681b provides that a consumer reporting agency may furnish reports only in specified circumstances. Subsection (3)(E) allows such reports to be furnished to a person it has reason to believe has a *legitimate business need* for the information in connection with a business transaction involving the consumer.

The fact that a consumer has had a landlord-tenant problem cannot, at this stage, be held to be completely irrelevant to his financial credibility, and the plaintiffs do not argue otherwise. Further, the issue is whether UNI–CHECK *has reason to believe* that a merchant has a legitimate business need for such information. This issue cannot be determined at this stage of the proceedings.

4. *Violation of § 1681 e(a).* This section provides in relevant part:

(a) Every consumer reporting agency shall maintain reasonable procedures designed . . . to limit the furnishing of consumer reports to the purposes listed under section 1681b of this title.

 Section 1681b sets out the circumstances under which a consumer report may be issued. Plaintiffs argue that there has somehow been a violation of § 1681b as it relates to § 1681 e(a). The court finds this argument to be unpersuasive in that plaintiffs have failed to make a sufficient factual showing that § 1681b has been violated at all, or that UNI–CHECK has not followed reasonable procedures to avoid violations of § 1681b.

## II. FAIR DEBT COLLECTION PRACTICES ACT.

Under the relevant provisions of the Act, a "debt collector" is defined as:

any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

15 U.S.C. § 1692 a(6).

 Plaintiffs argue that RENTCHECK is a debt collector because it regularly collects the debts owed by tenants to landlords. The record, however, shows only that RENTCHECK sought to collect on amounts it had to pay the landlords pursuant to its rent guarantee. These are not debts "owed or due another". There is nothing to show, for example, that

RENTCHECK sought to collect damages incurred by landlords which were in excess of such payments.

Plaintiffs also contend that UNI-CHECK is a debt collector within the meaning of the Fair Debt Collection Act. The record only shows, however, that UNI-CHECK at most simply reports the bad experiences of its subscribers. If this somehow helps its subscribers collect on debts owed to them, such a result does not seem to be a matter falling within the scope of the Act. A contrary ruling would necessarily result in a finding that all credit reporting agencies are also debt collectors, a result which seems far beyond the contemplation of the Fair Debt Collection Act.

For the reasons given, partial summary judgment is GRANTED in favor of Plaintiffs on the status of UNI-CHECK as a credit reporting agency, and UNI-CHECK's violation of §§ 1681 e(b) and i(c) of the Fair Credit Reporting Act. Plaintiffs' motion for summary judgment is DENIED in all other respects.

IT IS SO ORDERED.