ROSENBAUM, Circuit Judge,
concurring:
I agree with the panel opinion. I write separately, though, to address in more depth some of the issues this appeal raises.
I.
A.
We have previously described the twin goals of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, et seq., as “ensuring that [credit-reporting] agencies imposed procedures that were ... ‘fair and equitable to the consumer,’ ... [and] that also met the ‘needs of commerce’ for accurate credit reporting.” Cahlin v. Gen. Motors Acceptance Corp., 936 F.2d 1151, 1158 (11th Cir, 1991) (quoting 15 U.S.C. § 1681(b)). Towards those ends, 15 U.S.C. § 1681e(b) requires that “[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.”
Here, the dispute concerns the meaning of “maximum possible accuracy” within § 1681e(b). All four Circuits that have opined on this phrase have agreed that it means something more than “technical accuracy.” See Cortez v. Trans Union, LLC, 617 F.3d 688, 709 (3d Cir. 2010) (describing the “distinction between ‘accuracy’ and ‘maximum possible accuracy”’ as “quite dramatic”); Dalton v. Capital Associated Indus., Inc., 257 F.3d 409, 415 (4th Cir. 2001) (“A report is inaccurate when it is ‘patently incorrect’ or when it is ‘misleading in such a way and to such an extent that it can be expected to [have an] adverse []’ effect”) (citation omitted); Koropoulos v. Credit Bureau, Inc., 734 F.2d 37, 40 n.4 (D.C. Cir. 1984) (“We think it clear that Congress meant the Act to address more than technically inaccurate reports.”); Pinner v. Schmidt, 805 F.2d 1258, 1262-63 (5th Cir. 1986); cf. Gorman v. Wolpoff & Abramson, LLP, 584 F.3d 1147, 1163 (9th Cir. 2009) (discussing the difference between “technical ] [in]accura[cy]” and “inaccurate” while opining on the meaning of the phrase “if the investigation finds that the information is incomplete or inaccurate,” found within 15 U.S.C. § 1681s-2(b)(l)(D)).
Rather, based on the language of the phrase and the purpose of the FCRA, these courts have determined that “maximum possible accuracy” means that a report must not be misleading or incomplete. See Cortez, 617 F.3d at 709; Dalton, 257 F.3d at 415; Koropoulos, 734 F.2d at 40-44; Pinner, 805 F.2d at 1262-63. As the Fourth Circuit has explained, “A report is inaccurate ... when it is misleading in such a way and to such an extent that it can be expected to have an adverse effect.” Dalton, 257 F.3d at 415 (alteration, quotation marks, and citation omitted).
Judge Fong succinctly and effectively explained the practical and important difference between a report that is “technically accurate” and one that has “maximum possible accuracy”: it’s the difference between “report[ing] that a person was ‘involved’ in a credit card scam” and “reporting] that he -was in fact one of the victims of the scam.” Alexander v. Moore *1284 & Assocs., Inc., 553 F.Supp. 948, 952 (D. Haw. 1982); see also Pinner, 805 F.2d at 1263 (quoting Judge Fong’s explanation, as quoted in Swoager v. Credit Bureau of Greater St. Petersburg, 608 F.Supp. 972, 977 (M.D. Fla. 1985)); Cortez, 617 F.3d at 709 (quoting Pinner's reliance on Judge Fong’s explanation).
But though § 1681e(b) speaks of “maximum possible accuracy,” it also qualifies the limits of the required “maximum possible accuracy.” A credit-reporting agency need only follow “reasonable procedures to assure maximum possible accuracy.” 15 U.S;C. § 1681e(b).-
The District of Columbia Circuit has construed this language to impose a balancing test. Koropoulos, 734 F.2d at 42. Under this balancing test, the court “weights] the potential that the information will create a misleading impression against the availability of more accurate [or complete] information and the burden of providing such information.” Id. (quoting Alexander, 553 F.Supp. at 952) (quotation marks omitted). The greater the potential to mislead (meaning, “the greater the harm [the information] can cause the consumer”) and thé more readily available “clarifying information,” the higher the reporting agency’s burden to provide the clarifying information. Id. (quoting Alexander, 553 F.Supp. at 952) (quotation marks omitted). But on the other side of the coin, a reporting agency need not undertake a búrdensome task to provide clarifying information when “the misleading information is of relatively insignificant value” and the agency’s procedures are otherwise reasonable. Id. (quoting Alexander, 553 F.Supp. at 952) (quotation marks omitted); see also Cortez, 617 F.3d at 709 (“Judging the reasonableness of a credit reporting agency’s procedures involves weighing the potential harm from inaccuracy against the burden of safeguarding against such inaccuracy.”) (citation and quotation marks omitted).
B.
With these standards in mind, X consider whether TransUnion’s reporting of Pedro’s parents’ delinquent account information on Pedro’s credit report satisfied the “maximum possible accuracy” standard. First, we must assess whether the inclusion óf the information was misleading in a harmful way. Clearly, it was.
True, TransUnion reported that Pedro was only an authorized user on her parents’ account. TransUnion also asserted during oral argument that those who use the reports would understand from the code TransUnion used to report her authorized-user status that Pedro was not financially responsible for her parents’ delinquent account. But significantly, the report appears to give no indication that including this account information caused Pedro’s credit score to drop more’than 100 points. That 100-point-plus drop — due to no fault of Pedro’s — harmed Pedro in that it “reduc[ed] ... her ability to obtain credit, ... increased] ... the cost of obtaining such credit that she was able to secure, los[t] [her] economic opportunities, and los[t] [her] creditworthiness.” Compl., ¶ 30. Yet the information did not accurately reflect on her personal creditworthiness. Indeed, almost as soon as the information was removed, Pedro’s credit rating returned to its “prior excellent level.” Id. at ¶ 29.
We have said that FCRA’s goals include fairness and equity to the consumer while still meeting the needs of commerce for accurate information in credit reports. Reporting delinquent “authorized user” accounts where the user is not financially responsible for the debt, without indicating how including such information in the credit score affects the credit score meets *1285 neither goal. Rather, stating the consumer’s credit score both with and without accounts for which she is not financially •responsible gives the consumer and those who rely on credit reports the fairest, most accurate, and least misleading picture of the consumer’s credit. And for this reason, it much better satisfies the purposes of FCRA than the reporting practice at issue here.
But that is not the end of the analysis. We must also consider the burden on TransUnion to provide such information in its credit reports. TransUnion uniquely possesses the information necessary to evaluate the burden such a procedure would place on it. For that reason, this part of the inquiry of whether Pedro' stated a claim that TransUnion violated § 1681e(b) often will be inappropriate for resolution at the motion-to-dismiss stage.
II.
Here, though, we need not remand this matter to the district court for further proceedings because Pedro alleges only a willful violation. And for the reasons my colleague has explained, she cannot show that.